*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BOSHELL/SHELTON, Minors.

FOR PUBLICATION
July 02, 2025
2:43 PM

No. 371973
Wayne Circuit Court
Family Division
LC No. 2023-000203-NA

Before: MALDONADO, P.J., and BOONSTRA and WALLACE, JJ.

MALDONADO, P.J.

Respondent appeals as of right the trial court's order terminating her parental rights to ZTB, ZEB, and ZRB (the boys), pursuant to MCL 712A.19b(3)(a)(*ii*) (desertion of child for 91 or more days and custody not sought) and (b)(*ii*) (failure to prevent physical abuse and reasonable likelihood of future abuse). We reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Respondent's case arises in tandem with the tragic death of a young child—a child that was not respondent's, nor in her care. Unfortunately, though, the circumstances surrounding the child's death appear to have been imputed to respondent in such a way that she lost the parental rights of her own six children.

In addition to her three boys, respondent also has three girls—LMS, CLS, and LSS (the girls). The boys and two of the girls—LMS and CLS—lived with respondent and the boys' father, Z. Boshell. LSS, however, lived with the girls' father, S. Shelton; his partner, V. Hamilton; and Hamilton's children. LMS and CLS occasionally visited Shelton's home to spend time with their sister and father. In early 2023, Hamilton and Shelton were arrested for the torture and murder of one of Hamilton's sons. The medical staff suspected that the boy's death was caused by physical abuse because he presented with bruising over most of his body, lacerations, abrasions, puncture wounds, a fractured spine, hip and skull deformity, a necrotic toe that was mostly unattached, and bruising around his rectum.

Upon investigation, the police discovered that Shelton's home was like a construction site, with exposed brick, exposed electrical wiring, and no interior walls. There was no heat and an unsecured firearm. The floors were covered in dirt, trash was scattered throughout the home. The basement floor was covered in raw sewage. The children did not have beds, and the stove was covered with old food. An investigating officer opined that the house was not suitable for anyone to live in, especially children.

Shelton was promptly arrested and charged with felony murder, torture, conspiracy to commit torture, and two counts of first-degree child abuse. Petitioner then sought custody of respondent's children, primarily making allegations against Shelton and his appalling treatment of all the children in his care, but also alleging that respondent knew or should have known about the abuse in Shelton's house because LMS and CLS "were going back and forth" from Shelton's house to respondent's house. The trial court released the boys into Boshell's care on the condition that respondent leave the home, so she moved in with her mother. However, respondent later agreed to move out of her mother's home so that all three girls could be placed there. As a result, respondent initially stayed with friends and eventually moved into a motel.

Following a trial, the trial court took jurisdiction over all of respondent's children, mainly on the basis of her "neglectfulness" and "failure to monitor the children" such that she did not discover the issues that led to the death of Hamilton's son. The trial court then found statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(a)(*ii*) and (b)(*ii*) on the basis of respondent's "willful ignorance" and failure to follow up on "red flags" and "clues" regarding the situation inside Shelton's home. After a best-interests hearing, the trial court found that termination was in the children's best interests because respondent's lack of a permanent home rendered her unable to provide the children with permanency, stability, and finality.

Respondent appealed the order terminating her parental rights of the boys, arguing that the trial court made four errors requiring reversal. In particular, the trial court (1) improperly exercised jurisdiction over the boys when there was no evidence that they were mistreated or faced anticipatory risk of being mistreated; (2) failed to require DHHS to make reasonable efforts toward reunification; (3) found statutory grounds for termination pursuant to MCL 712A.19b(3)(a)(*ii*) and 712A.19b(3)(b)(*ii*) when there was no evidence that respondent deserted her children or failed to protect them; and (4) determined that termination was in the boys' best interests, despite that they were bonded with respondent and placed with their father, who wished to co-parent with respondent. We find each argument persuasive.

II. JURISDICTION

Respondent first argues that the trial court clearly erred by finding statutory grounds to assume jurisdiction over the boys when no evidence indicated that the boys were abused, abandoned, or neglected. We agree.

The purpose of child protective proceedings is the protection of the child. *In re Brock*, 442 Mich 101, 107; 499 NW2d 752 (1993). "In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). Generally, a trial court determines whether it may exercise jurisdiction over the child during the adjudicative phase. *Id*. The trial court must hold an adjudicative hearing

to determine "whether the trial court can exercise jurisdiction over the child (and the respondents-parents) under MCL 712A.2(b) so that it can enter dispositional orders, including an order terminating parental rights." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). "[T]he petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition." *Id*. see also MCR 3.972(C)(1); MCR 3.977(E)(2). A "preponderance of the evidence" is evidence that, "when weighed with that [evidence] opposed to it, has more convincing force and the greater probability of truth." *People v Cross*, 281 Mich App 737, 740; 760 NW2d 314 (2008).

"Although child protective proceedings are initiated to protect children, the adjudicative phase is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *In re Long*, 326 Mich App 455, 459-460; 927 NW2d 724 (2018) (quotation marks and citation omitted). "Adjudication protects the parents' fundamental right to direct the care, custody, and control of their children, while also ensuring that the state can protect the health and safety of the children." *Sanders*, 495 Mich at 422.

"Challenges to the court's decision to exercise jurisdiction are reviewed for clear error in light of the court's finding of fact." *In re Kellogg*, 331 Mich App 249, 253; 952 NW2d 544 (2020) (quotation marks and citation omitted). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. (quotation marks and citation omitted).

In the present case, the trial court assumed jurisdiction over all six children under MCL 712A.2(b)(1), which permits a trial court to take jurisdiction over a minor child:

> [w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

At trial, petitioner conceded that respondent did not abuse any of her children. Instead, petitioner made clear that its only argument for jurisdiction was that respondent neglected her children because she should have known about the conditions in Shelton's house.[1] The trial court apparently accepted this argument when it determined that respondent's "neglectfulness here rises to the level of the Court being able to exercise jurisdiction." and that "[respondent's] failure to

---

[1] On appeal, petitioner argues that in addition to neglect, there was testimony regarding respondent's past substance abuse and untreated mental health. In particular, petitioner asserts that respondent admitted to taking unprescribed Xanax as recently as five years before these proceedings and that respondent was not receiving consistent treatment for her bipolar disorder. However, as noted, the trial court's assumption of jurisdiction was based on respondent's alleged neglect regarding Shelton's home.

monitor the children and the situation contributed and didn't enable the discovery of the issues which led to the tragic death of [Hamilton's son]."

Preliminarily, we note that for the trial court to assume jurisdiction over the *boys* on the basis that respondent neglected the *girls*, the trial court first had to determine that respondent neglected the girls. However, the record does not support the trial court's determination that respondent neglected *any* of her children.

As noted, respondent shared three children with Shelton (the girls). Respondent and Shelton were never married. Respondent testified that when they "split up," they did not have a formal custody arrangement. She took CLS and LMS, and Shelton took LSS, who was approximately four years old at the time. Respondent asked Shelton for more time with LSS on "multiple occasions" and even notified the police that Shelton would not give respondent "full access" to LSS. However, the police told respondent that it was "a court matter," and respondent acknowledged that she did not pursue the issue in court.

Shelton lived with LSS in an apartment and initially withheld the address from respondent. Respondent eventually visited the apartment, though, and the conditions were "completely fine." However, about a year before these proceedings, Shelton moved with Hamilton into the house previously described—one that respondent's own attorney referred to as a house of horrors. According to respondent, that is when "[t]hings started to change." Shelton only allowed LSS to visit respondent's home once a month. Shelton never provided respondent with his new address and always exchanged LSS with respondent in a public place, such as Home Depot. Respondent testified that the fact that Shelton withheld his new address "raised some suspicion," but "it wasn't that suspicious because he had [done] it before." Regarding the other two girls, CLS and LMS often visited Shelton and LSS when he lived in his apartment, but respondent rarely let them visit once Shelton was in his new house because "[h]e was just bad at [bringing] them back on time." When CLS and LMS did stay at Shelton's, they never said anything to respondent about the conditions in the house except that they "would want to go back."

Likewise, LSS's testimony at trial did not support that respondent knew about the conditions in Shelton's home. LSS confirmed that she had to stay in the basement sometimes, such as when she did not pick up her toys, and that CLS and LMS had to stay in Shelton's basement at some point, too. However, LSS never indicated that she or any of the girls ever told *respondent* about staying in the basement.

We note that a Children's Protective Services (CPS) investigator testified that LSS told *her* that LMS told *respondent* that the girls slept in a "poopie basement." However, this testimony constitutes hearsay within hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[2] *In re Utrera*, 281 Mich App 1, 18; 761 NW2d 253 (2008) (quotation marks and citation

---

[2] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). This opinion relies on the version of MRE 801(c) in effect at the time of trial. As amended, MRE 801(c) now provides:

omitted). "Hearsay is inadmissible unless the rules of evidence provide otherwise." *Id.* Hearsay within hearsay is inadmissible unless each independent hearsay statement fits within a hearsay exception. *Kuebler v Kuebler*, 346 Mich App 633, 662; 13 NW3d 339 (2023). The rules of evidence generally apply at a trial in a child-protective proceeding. *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014); MCR 3.972(C)(1); MCR 3.977(E) and (F). Thus, the social worker's testimony about LSS's statements could not be used to support the trial court's jurisdiction determination.[3]

At any rate, when the trial court assumed jurisdiction over the boys, its findings were unrelated to LSS's disclosures or what respondent actually knew about Shelton's home and abuse. Rather, the trial court seemed focused on what respondent *should have known*. Indeed, petitioner argued strenuously that even a "modicum of curiosity" could have "prevented all of this from occurring." The record supports that respondent *was* curious, though. In the four years after she ended her relationship with Shelton, respondent reported him to CPS at least twice—once because she suspected that Shelton hit LMS with a stroller and once because she suspected that Shelton neglected to enroll LSS in school. Though less clear, the record also indicates that respondent informed CPS that she was concerned about whether LSS was being fed properly while in Shelton's care. The record does not reveal whether or to what extent CPS investigated each of respondent's reports. In other words, it may be *CPS* that did not exhibit much curiosity about the children in Shelton's care. Considering the scarcity of evidence that respondent actually knew or should have known about the abuse occurring in Shelton's home, we are not convinced that respondent neglected the girls. See MCL 712A.2(b)(1).

But even if this Court accepts that respondent neglected the girls, such a determination does not confer jurisdiction over the boys. The legal theory that supports such a connection is the doctrine of anticipatory neglect. See *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020) ("In cases with multiple children, the doctrine of anticipatory neglect may apply to confer jurisdiction.").[4] "The doctrine of anticipatory neglect recognizes that how a parent treats one child

---

> (c) Hearsay. "Hearsay" means a statement that:
>
> (1) the declarant does not make while testifying at the current trial or hearing; and
>
> (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

[3] Though MCR 3.972(C)(2) provides an exception for the admission at trial of a child's hearsay statements about abuse, the trial court never held the requisite hearing to determine whether the circumstances surrounding LSS's forensic interview had adequate indicia of trustworthiness, such that her statements could be admitted under MCR 3.972(C)(2). Moreover, the record is devoid of information about the interview, precluding appellate review.

[4] Application of the anticipatory-neglect doctrine is not dependent on the trial court expressing use of the doctrine during adjudication. See *Kellogg*, 331 Mich App at 259 (applying the anticipatory-

is certainly probative of how that parent may treat other children." *Id*. "However, the probative value of such an inference is decreased by differences between the children, such as age and medical conditions." *Id*. Consequently, jurisdiction may not always be properly assumed on the basis of the anticipatory-neglect doctrine. *Id*.

In this case, the doctrine of anticipatory neglect does not support the trial court's jurisdiction over the boys. First, the difference between LSS and the boys is obvious. LSS lived with Shelton, her father, who was criminally charged with abuse. The boys lived with respondent and Boshell, their father, neither of whom is alleged to have abused the boys. Likewise, LMS and CLS occasionally visited Shelton's home, but the boys *never* visited Shelton's home. The difference in the living situations between the boys and the girls significantly decreases the probative value of respondent's possible neglect of the girls. See *Kellogg*, 331 Mich App at 259. Accordingly, even if this Court accepts that respondent's treatment of any of the girls was neglectful, the trial court's assumption of jurisdiction over the boys solely on the basis of anticipatory neglect was clearly in error. See *In re Kellogg*, 331 Mich App at 253.

## III. REUNIFICATION EFFORTS

Respondent also argues that the trial court erred by releasing petitioner from its obligation to make reasonable efforts toward reunification in the absence of aggravating circumstances. That is, because the boys were not subjected to aggravating circumstances, the trial court committed plain error when it held that petitioner was not required to make reasonable efforts to reunify respondent and the boys. We agree.

This issue is unpreserved because respondent failed to raise a reasonable-efforts argument before her parental rights were terminated. See *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022). Unpreserved errors in child-protective proceedings are reviewed for plain error. *Utrera*, 281 Mich App at 8. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Utrera*, 281 Mich App at 9. If those three requirements are met, reversal is warranted when the error "seriously affected the fairness, integrity or public reputation of judicial proceedings." *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019) (quotation marks, citations, and alterations omitted).

"Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances." *In re Simonetta*, 340 Mich App 700, 707; 987 NW2d 919 (2022) (quotation marks and citation omitted). "Absent aggravating circumstances, the DHHS has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *Id*. (quotation marks and citation omitted). Reasonable efforts toward reunification are not necessary if "[t]here is a judicial determination that the parent has subjected

---

neglect doctrine to a trial court's finding of jurisdiction where the trial court did not reference the doctrine when it assumed jurisdiction).

the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, [MCL 722.638].” MCL 712A.19a(2)(1). MCL 722.638 provides, in relevant part:

> (1) The department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2, if 1 or more of the following apply:

> (a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child’s home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:

> (*i*) Abandonment of a young child.

> (*ii*) Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate.

> (*iii*) Battering, torture, or other serious physical harm.

> (*iv*) Loss or serious impairment of an organ or limb.

> (*v*) Life threatening injury.

> (*vi*) Murder or attempted murder.

> \* \* \*

> (2) In a petition submitted as required by subsection (1), if a parent is a suspected perpetrator or is suspected of placing the child at an unreasonable risk of harm due to the parent’s failure to take reasonable steps to intervene to eliminate that risk, the department shall include a request for termination of parental rights at the initial dispositional hearing as authorized under [MCL 712A.19b].

In this case, the trial court held that pursuant to MCL 722.638(2), no efforts should be made to reunify respondent and the boys because respondent failed to protect her children from Shelton when she knew “his propensity.” Consequently, petitioner did not provide reasonable efforts toward reunification for respondent. This was plainly in error.

This Court recently clarified that aggravating circumstances cannot be found under MCL 722.638(2) with respect to a parent who failed to protect their child unless one of the enumerated persons in MCL 722.638(1)(a) committed an act of abuse listed in MCL 722.638(1)(a)(*i*)-(*vi*). *In re Barber/Espinoza*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 369359); slip op at 7, oral argument ordered on the application ___ Mich ___ (2025) (Docket No. 167745). Stated differently, the requirements of MCL 722.638(1) must be met before a trial court can use MCL 722.638(2) to find aggravating circumstances. *Id*. at ___; slip op at 8.

The trial court plainly erred by finding that the boys were subjected to aggravating circumstances because Shelton and Hamilton—the abusers—were not a parent, guardian, or

custodian of the boys, and nothing in the record suggests that they ever resided with the boys. Furthermore, nothing in the record suggests that respondent or Boshell—the boys' parents and the only adults they ever lived with—engaged in any act of abuse enumerated in MCL 722.638(1). Because the requirements in MCL 722.638(1) were not met, the trial court plainly erred by finding that aggravating circumstances existed with respect to the boys under MCL 722.638(2) and that, as a consequence, petitioner was not obligated to make reasonable reunification efforts for respondent and the boys. See *Barber/Espinoza*, ___ Mich App at ___; slip op at 8.

Moreover, in *Barber/Espinoza*, this Court concluded that the trial court's erroneous determination that aggravating circumstances existed improperly released the petitioner from its responsibility to provide reasonable reunification efforts prejudiced the respondent. This Court explained:

> Nevertheless, we conclude that the trial court's error prejudiced defendant because (1) it is unclear how an aggrieved respondent could establish outcome-determinative error concerning the denial of reunification services altogether and (2) the error improperly dispensed with a critical aspect of a child protective proceeding—the requirement to offer reunification services before terminating parental rights—affected the very framework within which this case progressed, undermined the foundation of the rest of the proceedings, and impaired respondent's fundamental right to direct the care, custody, and control over her children. [*Id*. at ___; slip op at 9.]

Even more recently in *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 369318); slip op at 7, this Court held that the foregoing analysis from *Barber/Espinoza* applies with equal force to any case in which a trial court terminates a respondent's parental rights after erroneously concluding that reasonable efforts toward reunification were unnecessary. Additionally, the erroneous deprivation of reasonable efforts toward reunification seriously affects the fairness and integrity of child-protective proceedings. *Id*. Accordingly, we conclude that the trial court prejudiced respondent by its erroneous determination that reasonable efforts toward reunification were not required. See *Barber/Espinoza*, ___ Mich App at ___; slip op at 10.

## IV. STATUTORY GROUNDS

Respondent next argues that trial court clearly erred by finding statutory grounds for termination under MCL 712A.19b(3)(a)(*ii*) and (b)(*ii*) because the record demonstrated that respondent remained actively involved in her boys' lives and there was no evidence of physical abuse or facts indicating that respondent failed to prevent harm when she had an opportunity to do so. Again, we agree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Additionally, a trial court is required to state on the record or in writing its findings of fact and conclusions of law with respect to whether parental rights should be terminated. MCL 712A.19b(1). This Court reviews the trial court's determination of statutory grounds for clear error. *Id*.; MCR 3.977(K). "A trial

court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (quotation marks and citation omitted; alteration removed).

Parents have a "fundamental right to direct the care, custody, and control" of their children. *Ferranti*, 504 Mich at 21 (quotation marks and citation omitted). "To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011) (quotation marks and citation omitted).

Pursuant to MCL 712A.19b(3)(a)(*ii*), a court may terminate parental rights if it finds clear and convincing evidence that "[t]he child's parent has deserted the child for 91 or more days and has not sought custody of the child during that period." Nothing in the record suggests that respondent abandoned the boys. The boys lived with respondent before the trial court removed them from her care. After removal, respondent attended every court hearing, seeking custody of the boys throughout the case. Therefore, the trial court clearly erred by finding a statutory ground for termination under MCL 712A.19b(3)(a)(*ii*).

Turning to MCL 712A.19b(3)(b)(*ii*), a court may terminate parental rights if it finds clear and convincing evidence that the child or a sibling suffered physical injury or physical or sexual abuse and "[t]he parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home." The harm contemplated by MCL 712A.19b(3)(b)(*ii*) "must be caused by a parent's act or a nonparent adult's act and not merely contributed to by an unintentional omission." *In re LaFrance*, 306 Mich App 713, 725; 858 NW2d 143 (2014) (quotation marks omitted). "MCL 712A.19b(3)(b)(*ii*) addresses the harm occasioned by a parent who is unwilling or unable to protect his or her children from abuse." *In re Gonzales/Martinez*, 310 Mich App 426, 432; 871 NW2d 868 (2015).

In the present case, the trial court stated only:

> The Court finds, by clear and convincing evidence, that a statutory basis does exist for the termination of the mother's parental rights, pursuant to MCL 712A.19b(3)(b)(ii), and also (a)(ii). And the issue here is what—you heard the arguments and testimony that it's the willful ignorance of the mother. There were a number of red flags in this case, hand offs at Home Depot, never being able to visit at their home, having someone's mother's head in the sand, in essence, for three years. If these matters had been followed up, you know—it should have been followed up. And the failure to follow up on these red flags and these clues really constitutes a failure of her duties as a parent.

It is evident that LSS suffered abuse when she was subjected to living in her biological father's deplorable home, forced to stay in the sewage-filled basement, and denied necessary food. We note, though, that the trial court did not make such a finding, which would have greatly assisted appellate review. Nevertheless, we consider whether respondent had an opportunity to prevent the abuse and failed to do so. Respondent repeatedly requested that Shelton give her more access to

-9-

LSS, but he not only denied this request, he also withheld his address on more than one occasion. The record indicates that respondent suspected that Shelton had hit LMS with a stroller, that LSS was not in school, and that LSS was underfed. However, respondent notified CPS about each of her concerns, but the record fails to show whether CPS fully investigated. Respondent also went to the police, who told her to take the matter up in court. Accordingly, the picture that this case paints is not that of a neglectful mother. To the contrary, the record supports that respondent repeatedly made efforts to investigate Shelton. Moreover, even if the record supported a finding that respondent had an opportunity to prevent the abuse of LSS (a sibling of the boys) and failed to do so, MCL 712A.19b(3)(b)(*ii*) additionally requires "a reasonable likelihood that the [*boys*] will suffer injury or abuse in the foreseeable future if placed in the parent's home." [Emphasis added.] The record does not support such a finding. Therefore, we conclude that the trial court clearly erred by finding a statutory ground for termination under MCL 712A.19b(3)(b)(*ii*).

## V. BEST INTERESTS

Finally, respondent argues that the trial court clearly erred by finding that termination was in the boys' best interests without considering the boys' placement with Boshell. We agree.

"Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re Keillor*, 325 Mich App 80, 93; 923 NW2d 617 (2018) (citation omitted). "Best interests are determined on the basis of the preponderance of the evidence." *Id.* (citation omitted). The trial court should consider all of the evidence when determining whether it is in the child's best interests to terminate parental rights. *White*, 303 Mich App at 713. The trial court should consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Id.* (citation omitted).

"[T]he fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests." *In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012), (quotation marks and citation omitted). "A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *Id.*

In the past, a child's biological parent was not recognized in the definition of "relative." *In re Schadler*, 315 Mich App 406, 413; 890 NW2d 676 (2016). However, MCL 712A.13a was amended by 2022 PA 200, effective October 7, 2022, and now defines a "relative" as any adult "[r]elated to the child within the fifth degree by blood, marriage, or adoption . . . ." MCL 712A.13a(1)(j)(*i*). The statute does not define the new phrase "within the fifth degree by blood," but a different chapter of the Probate Code of 1939, the Michigan Adoption Code, defines that particular phrase to include a parent. MCL 710.22(y). Therefore, we conclude that "relative" under MCL 712A.13a(1)(j) now includes a biological parent.

The trial court did not articulate *any* findings specific to the best interests of the boys, focusing instead on the girls. Most notably, the trial court acknowledged that the girls' placement with their grandmother weighed against termination, but the trial court failed to similarly consider

-10-

that the boys resided with Boshell, their parent.  This error requires reversal.  See *In re Olive/Metts Minors*, 297 Mich App at 43.

## VI.  CONCLUSION

We reverse the order assuming jurisdiction and the order terminating respondent's parental rights, and remand for proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Mark T. Boonstra
/s/ Randy J. Wallace